**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRANCIS PUNZO,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **NO.  20-5581** |
| | : | |
| **SUGARHOUSE CASINO,** | : | |
| | : | |
| *Defendant.* | : | |

<u>**MEMORANDUM OPINION**</u>

Goldberg, J.                                                                                                July 12, 2022

Plaintiff Francis Punzo alleges that he was subject to age and national origin discrimination. Plaintiff's claims stem from a September 2019 audition for the position of Table Games Dealer at Defendant Sugarhouse Casino wherein Defendant declined to offer him employment based upon Plaintiff's subpar performance in the audition process.  On November 9, 2020, following the Equal Employment Opportunity Commission's issuance of a Notice of Right to Sue, Plaintiff filed suit alleging national origin discrimination, age discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, and the Age Discrimination and Employment Act.

Defendant now moves for summary judgment as to all of Plaintiff's claims.  For the following reasons, I will grant the Motion in its entirety and enter judgment in favor of Defendant.

## I.    PRELIMINARY EVIDENTIARY OBJECTIONS

I first address Defendant's preliminary evidentiary objections concerning:   (1) Plaintiff's Supplemental Affidavit; (2) Plaintiff's reliance on missing Audition Forms; and (3) Plaintiff's denials in his Response to Defendant's Statement of Undisputed Facts.

A.    **Plaintiff's Supplemental Affidavit**

In connection with his Response to the Motion for Summary Judgment, Plaintiff submitted an "Affidavit," which purports to recount the pertinent facts of this case.  Defendant contends that this Affidavit should not be considered because it contains conclusory allegations of discrimination and retaliation that either (1) contradict Plaintiff's deposition testimony, rendering the affidavit a sham, or (2) are not based on personal knowledge.

Under the "sham affidavit" rule, "[a] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (citing Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir.1991)). In the case of a sham affidavit, the court will disregard "an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." Id. (internal quotation marks omitted). The United States Court of Appeals for the Third Circuit has explained:

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment.   A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the movant.

Jiminez v. All Am. Rathskeller, 503 F.3d 247, 253 (3d Cir. 2007).

Moreover, under Federal Rule of Civil Procedure 56, an affidavit used to support or oppose a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Where an affidavit fails to affirmatively show that it is based on personal knowledge, it cannot create a genuine issue of material fact for purposes of opposing summary judgment.  Solis v. A-1 Mortg. Corp., 934 F. Supp. 2d 778, 803–04 (W.D. Pa. 2013).

Here, Plaintiff's Affidavit suffers from both of these defects.  For example, in his deposition, Plaintiff testified that the first time he raised issues regarding nepotism, age, and ethnic problems with Defendant's Human Resources Manager was after his third audition.  (Def.'s Ex. F, Dep. of Francis Punzo ("Punzo Dep.") 155:13–22.)  Yet, in his Affidavit, Plaintiff contends that he "raised issues of nepotism, age and ethnic discrimination throughout all three auditions and additional conversations with Mr. Holden [Defendant's former Human Resources Business Partner], and correspondence with Mr. King [a Human Resources employee]."[1]  (Pl.'s Ex. 1, Aff. of Francis Punzo ("Punzo Aff.") ¶ 26.)  Moreover, in his Affidavit, Plaintiff discusses various aspects of how Defendant Casino's Dealer School works, who was the eldest student in the Dealer School classes, and Mr. Holden's motivations for his "dislike" of Plaintiff. (Id. ¶¶ 1, 9, 28.)  Yet, Plaintiff offers no explanation for how he would have knowledge of any of these facts.  Thus, to the extent Plaintiff's Affidavit either contradicts prior deposition testimony or discusses facts about which Plaintiff has not demonstrated personal knowledge, I will disregard the contradictory portion of the Affidavit.

### B.      Plaintiff's Reliance of Missing Audition Forms

Throughout his Response to Defendant's Statement of Undisputed Facts, Plaintiff denies facts based on Defendant's "destruction" or "discarding" of Audition Sheets used by evaluators during auditions for Table Games Dealers, claiming that the Audition Sheets were "the best evidence" from which to obtain certain information.  Plaintiff relies on the absence of these Audition Sheets and a presumed adverse inference in order to create a genuine issue of material fact for summary judgment.

I fully addressed the absence of the Audition Sheets in my January 5, 2022 Memorandum Opinion, issued after the parties completed summary judgment briefing.  There, I found that there had

---

[1]      Plaintiff references Defendant's supplemental response to Plaintiff's interrogatories wherein Defendant averred that "Plaintiff discussed his concerns with the audition process and stated that he felt discriminated against with Bob Little, former Director of Table Games sometime after Plaintiff's second audition but prior to Plaintiff's third audition." (Pl.'s Ex. 3.)  This interrogatory response does not support Plaintiff's current allegation that (a) he ever raised these issues with Howard Holden prior to his third audition, or (b) that he ever raised the specific issues of nepotism, age, or ethnic discrimination prior to this third audition.

been no actual suppression or withholding of evidence by Defendant warranting a spoliation inference.  I also explained that although the Audition Sheets could have been relevant, Plaintiff had not demonstrated prejudice since, by all accounts, limited information about each audition was noted on the sheets.  I further noted that Plaintiff had the opportunity to depose all of the individuals involved in his audition process, but failed to do so and, in fact, did not depose a single representative of Defendant.

Given this ruling, to the extent Plaintiff denies one of Defendant's asserted facts based purely on the absence of an Audition Sheet, I will deem that fact admitted.

### C.     Plaintiff's Blanket Denials of Facts

Defendant's final evidentiary concern involves Plaintiff's denials of Defendant's asserted facts. Throughout his Response to Defendant's Statement of Undisputed Facts, Plaintiff disputes facts either (a) without further elaboration or citation to contrary evidence, based on his lack of knowledge  (see, e.g., Pl.'s Response to Def.'s Statement of Undisputed Facts ¶¶ 8, 12, 16, 17, 18, 38); or (b) by citing to additional unrelated facts (see, e.g., id. ¶¶ 5, 7, 30, 40, 47.)

 "[T]o successfully resist summary judgment, the party opposing the motion may not rest upon mere denials of the facts identified by its claims." McElyea v. Navistar Int'l Transp. Corp., 788 F. Supp. 1366, 1377 (E.D. Pa. 1991), aff'd 950 F.2d 723 (3d Cir. 1991).  "Instead, the party opposing the motion for summary judgment is required to identify, specifically, the evidence of record which supports the claim and upon which a verdict in its favor may be based." Id.  "It follows, therefore, that the party opposing summary judgment cannot rest upon the argument that, although it has no contradictory evidence, its evidence does not corroborate that of the movant."  Id.

Plaintiff's unsupported denials of Defendant's facts are improper.  To the extent Plaintiff denies a fact asserted by Defendant but does not cite any contrary evidence, I will deem that fact admitted.  See Policies & Procedures of Hon. Mitchell S. Goldberg, Civil Matters ¶ 11 ("The Court will accept all material facts set forth in the moving party's statement as admitted unless controverted by the opposing party.")

4

## II.      FACTUAL BACKGROUND

For purposes of general background, the following facts are derived from the evidence

submitted by the parties and the parties' statements of facts.  Where there is conflicting evidence about

a particular fact, Federal Rule of Civil Procedure 56 requires that I view those facts and evidence in the

light most favorable to Plaintiffs.[2]

### A.      General Background on the Casino's Dealer School

In the fall of 2019, Defendant, Sugarhouse Casino, operated a Table Games Dealer School

("Dealer School") which is a six week training program created to teach individuals the skills necessary

to become a table games dealer.  (DSUF ¶ 1; PR ¶ 1.)  An individual must apply for and be accepted into

the Dealer School, during which an instructor provides training in various subject areas including dealing

and card placement.  (DSUF ¶¶ 2–3; PR ¶¶ 2–3.)

To ensure that each student is developing the skills and knowledge necessary to meet the requisite

qualifications for a dealer position, students undergo auditions.  (DSUF ¶ 4; PR ¶ 4.)  Typically, during

the third week of the program, students are required to participate in a first live audition where they deal

the game of blackjack.  (DSUF ¶ 5; PR. ¶ 5.)  If a student passes the audition and satisfactorily completes

the remaining three weeks of the program, he/she is usually offered employment as a Table Games

Dealer.  (DSUF ¶ 6; PR ¶ 6.)  If a student fails the first audition, he/she is offered a second audition

approximately a week later.  (DSUF ¶ 7; PR ¶ 7.)  An instructor for the Dealer School critiques the

student's errors so that the student knows what to practice for at the second audition.  (Punzo Aff. ¶ 3.)

If the student fails the second audition, he or she is removed from the program.  Third auditions are

typically not provided.  (Def.'s Ex. A, Decl. of Sheri McQueen ("McQueen Decl.") ¶ 9; Def.'s Ex. B.)

---

[2]      References to the parties' pleadings will be made as follows: Defendant's Statement of
Undisputed Facts ("DSUF"); Plaintiffs' Response ("PR"), Plaintiffs' Statement of Undisputed Facts
("PSUF"), and Defendant's Response ("DR").  If a statement is disputed and the dispute can be easily
resolved by reference to the exhibits, I will cite the supporting exhibits.  If a statement is disputed, but
the dispute cannot be resolved by reference to the exhibits, I will note the dispute without resolving it.  I
will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

In the fall of 2019, Sheri McQueen, who was sixty-one years old, was the Instructor for the Dealer School.  (McQueen Decl. ¶¶ 10-11.)  Ms. McQueen did not conduct auditions of students and did not make decisions as to whether an individual passes or fails an audition.  (Id. ¶ 12–13.)

Defendant employed several other relevant personnel:

- **Bruce Condella** – Age sixty-one, and was employed by Defendant as a Table Games Instructor. (Def.'s Ex. C, Decl. of Melissa Garwood ("Garwood Decl.") ¶ 1.)  Mr. Condella conducted some auditions during the fall of 2019.  (DSUF ¶ 13; PR 13.)

- **Maritza Lewis** – Age forty-one, and was employed by Defendant as Table Games Dual-Role Shift Manager and conducted auditions during the relevant time frame.  (DSUF ¶¶ 14–15; PR ¶¶ 14–15; Def.'s Ex. D, Decl. of Maritza Lewis ("Lewis Decl.") ¶ 4.)

- **Howard Holden** – Age fifty-six, and was a former Human Resource Business Partner, who would assist in conducting auditions.  (DSUF ¶ 17; PR ¶ 17; Garwood Decl. ¶ 2.)

- **Bob Little** – Director of Table Games and seventy-seven years old at the time.  (DSUF ¶ 18; PR ¶ 18; Garwood Decl. ¶ 3.)

- **Jim King** – A low level Human Resources employee.  (DSUF ¶ 77; PR ¶ 77.)

### B.   The Audition Process

During an audition, students are called in one at a time.  (DSUF ¶ 19; PR ¶ 19.)  Among other tasks, students must deal several hands of blackjack.  (DSUF ¶ 20; PR ¶ 20.)  The number of hands dealt depends upon the person conducting the audition and the student.  (Lewis Decl. ¶ 11.)  If a student is performing well, the auditioner may not need the student to deal as many hands to determine the student's proficiency.  (Id. ¶ 12.)  If the auditioner feels an individual is nervous or not performing well, the auditioner may allow that individual to deal additional hands.  (Id.)  The auditions are pass/fail, and the decision is made by the person conducting the evaluation.  (Id. ¶ 13; Def.'s Ex. E.)

### C.   Plaintiff's Time in the Dealer School

In the summer of 2019, when he was fifty-seven years old, Plaintiff decided to apply to Defendant's Dealer School.  (DSUF ¶¶ 26–27; PR ¶¶ 26–27.)  Plaintiff had an initial interview with Jim King, Bruce Condella, and an individual named Mike, during which he was asked about the "craziest and most exciting thing" that had happened to him, to which Plaintiff replied that he hit a lottery scratch-off

in the amount of $100,000 for life.  (DSUF ¶ 28; PR ¶ 28.)  Plaintiff also took a math test and then had a one-on-one interview with Condella.  (Punzo Dep. 36:18–23.)  Upon passing this interview process, Plaintiff was admitted into the Dealer School, which started on Labor Day in 2019.  (DSUF ¶ 32; PR ¶ 32.)  Plaintiff admits that he experienced no discrimination during this process.  (DSUF ¶ 33; PR ¶ 33.)

Plaintiff attended the Dealer School evening class, and his instructor was Sherri McQueen.  (DSUF ¶ 24; PR ¶ 34.)  Plaintiff, who is of Italian descent, was enrolled along with another individual of Italian descent named Dominic Forte.  (DSUF ¶ 36; PR ¶ 36.)  Although Plaintiff was the oldest student in the evening class session of the Dealer School, a woman aged seventy-seven was enrolled in the Dealer School morning session.[3]  (DSUF ¶ 35; PR ¶ 35; Garwood Decl. ¶ 4.)  The seventy-seven year old woman was eventually hired to be a table games dealer on October 15, 2019.  (Garwood Decl. ¶ 5.)

Plaintiff alleges that the age and national origin discrimination started on the first day of Dealer School.  McQueen talked to Plaintiff in front of the whole class and made Plaintiff feel like she was going to focus on him "like her pet."  (Punzo Dep. 47:3–12.)  When Howard Holden came in the room and was told that Plaintiff had hit the lottery, Holden said, "what the hell do you need the job for then."  (Id. at 46:14–18.)  McQueen referred to Plaintiff as her "boo" (a slang term for boyfriend).  (Id. at 46:4–13.)

During Dealer School, McQueen made several comments that Plaintiff found offensive:

- Early on, McQueen said, "look at the way he's looking over there, like he's going to kill somebody.  I can't wait until he gets on the floor with people.  I'm going to be cracking up because nobody's going to want to mess with him."  (Id. at 47:10–20, 52:17–21.)

- On day two, while the other students were in the cafeteria for lunch, Plaintiff was in the classroom with McQueen and she began to discuss the other students, calling one girl "probably a stripper" and another guy "slow."  (Id. at 49:16–50:2.)

- McQueen used the words "mob thug," and "Joey Merlino" to refer to Plaintiff.  (Id. at 52:1–13.)

---

[3]      Plaintiff denies this fact and submits his affidavit, wherein he states that he attended the morning session on two occasions in order to make up for two nights he missed.  When he made up his days in the morning class, he states that there was no one who was seventy-seven years old.  (Pl.'s Ex. 1, Affidavit of Francis Punzo ("Punzo Aff.") ¶ 9.)  Plaintiff, however, does not claim to have any direct knowledge of the makeup of the morning session of the Dealer School at the time.  As such, the mere fact that he did not encounter a seventy-seven year old when he attended the morning session is insufficient to refute the direct statement, given by Defendant's HR Business Partner Director under oath.

- On one occasion, Ms. McQueen said Plaintiff had a "mob look on his face" and that another student better watch out because Plaintiff was going to kill them.  (Id. at 67:12–20.)

- On a different occasion, Ms. McQueen told Plaintiff that he looked like he knew about good cigars and asked Plaintiff to get some to give as a present.  She said, "You can leave class.  Take your time.  You know what you're doing.  Let me know how much when you get back but don't charge me any 'vig,'" which is a loanshark term.  (Id. at 60:13–61:10.)

- The class was doing a potluck for graduation and, according to Plaintiff, he "was labeled [by McQueen] in getting the sausage, peppers and onions because [he] made the Italian food because, you know, you got the Dago Italian—the Dago Italian—to  make the sausage peppers and onions."  (Id. at 167:20–168:2.)

Plaintiff believed these incidents to be discriminatory because they assumed everyone with an Italian look is in the mob or was a criminal.  (Id. at 58:8–10, 61:11–21.)  Plaintiff also believed that McQueen wanted to "butter [him] up to use [him] for things."  (Id. at 66 16–20.)

Plaintiff also discussed several incidents with Howard Holden.

- Howard Holden called him "old head" a number of times during a six-week period  (Id. at 62:1–2, 70:1–7.)  After that, some of his classmates started calling him "old head," which he believed was discriminatory because they were calling him old.  (Id. at 62:3–9.)

- Another student made a major money mistake, and Plaintiff caught it.  Holden stated to the student, "if you did that to Frank [Plaintiff], he's going to pull his knife and cut you up—cut you up with his blade."  (Id. at 70:9–18.)

Notably, as Defendant points out, neither McQueen nor Holden made similar comments to or about the other student of Italian descent, Dominic Forte.  (Id. at 53:11–16, 57:15–23, 61:22–24; DSUF ¶ 48; PR ¶ 48.)  Mr. Forte had no knowledge of any of the foregoing comments being made.  (Def.'s Ex. G, Dep. of Dominic Forte ("Forte Dep."), 13:25–14:25.)

Plaintiff testified that, during one part of the course, he scored the second highest on an assignment, while 80% of the class failed.  (Punzo Dep. 73:15–74:15.)  McQueen told Plaintiff that he already knew everything and he should let others answer questions.  (Id. at 74:24–75:15.)

**D.**   **Plaintiff's First Audition**

The first audition occurred approximately two-and-a-half weeks into dealer school.  (DSUF ¶ 57; PR ¶ 57.)  Plaintiff auditioned with Maritza Lewis, who failed Plaintiff because he did not demonstrate

proficiency as a table games dealer.  ((DSUF ¶ 59; PR ¶ 59; Lewis Decl. ¶ 6; Punzo Dep. 96:15–20.)

Plaintiff admitted that he made certain mistakes in his audition.  (Punzo Dep. 82:10–83:4.)  A younger

male and female student also failed the first audition. (DSUF ¶ 61; PR ¶ 61.)

Plaintiff complained of unfairness in his audition process.  First, even though Plaintiff was told

to be there at 4:00 p.m. sharp and no sooner, Dominic Forte and another student were permitted to audition

at a quarter to four.  (Punzo Dep. 77:4–7, 83:9–20.)  Plaintiff believed they received special treatment

because Mr. Forte's father worked at the Casino and the other student's girlfriend was a dealer in Ms.

McQueen's class the year before.  (DSUF ¶ 63; PR ¶ 63.)  Plaintiff also complained that other students

were told about their mistakes, but he was not, and he had to shuffle, but other students did not.  (Id. at

82:1–83:8, 85:1–11.)  Plaintiff testified that "[e]ach student had a different audition."  (Id. at 86:19–25.)

The next day, Holden called Plaintiff out of the classroom into the hallway and said, "I heard you

had problems with our audition process."  (Id. at 87:4–9.)  Bruce Condella, the Table Games Instructor,

was present and was holding Plaintiff's audition sheet which had writing on it, even though the day

before, there was no writing on it.  (Id. at 87:10–16.)  Condella told Plaintiff, "everything is going to be

fine, Frank, We know what we want.  You know the game.  Just do the second audition and you'll be

fine."  (Id. at 87:17–22.)  Plaintiff then returned to the classroom.  (Id. at 8:23–25, 910:25–91:4.)

### E.     **Plaintiff's Second Audition**

Approximately a week later, Plaintiff had a second audition with Lewis and Condella.  (DSUF ¶¶

66–67; PR ¶¶ 66–67.)  During his second audition, Plaintiff had to shuffle, make chips, and deal hands.

Plaintiff admitted that he made some errors, but he believed they were procedural and correctible.  (Punzo

Dep. 91:13–23.)  McQueen came into the room and told Plaintiff that his shuffle was good but they were

not going to allow him to move on.  (Id. at 92:1–4.)  When Plaintiff objected, Condella stated that they

would wait to talk to Holden.  (Id. at 92:5–20.)  When asked at his deposition whether he believed this

decision was based on discrimination, Plaintiff testified, "I think I rubbed somebody the wrong way."

(Id. at 93:13–18.)  He explained that he did not think that Holden liked him, "[b]ecause I guess I

questioned how he manages things, and I questioned how the tins are done at the place and I stumbled across their procedures there that they're not done correctly." (Id. at 94:5–8.)

The next day, Holden came to Plaintiff and said, "I don't usually do this, but I'm going to get you a third audition, okay, because, you  know, I want to put this to bed." (Id. at 98:1–7.)  Neither Ms. McQueen nor Ms. Lewis were aware of any other individuals who had been given a third audition. (McQueen Decl. ¶ 16.; Lewis Decl. ¶ 9.)

 **F.**  **Plaintiff's Third Audition**

Plaintiff's third audition was conducted by Bob Little, the former Director of Table Games. (Punzo Dep. 99:16–20.)  Plaintiff went into the room, and Condella, McQueen, and Holden were all sitting at a table as players. (Id. at 100:6–12.)  Little asked Plaintiff if he agreed to accept his decision as the final word. (Id. at 100:12–16.)  Plaintiff claimed the situation felt very pressured. (Id. at 101:2–8.)

At the end of the audition, Little said, "well, you know, you're a little slow, but we can work on that, and everything went okay.  You made a couple of mistakes." (Id. at 101:10–14.)  Little then indicated to Condella, McQueen, and Holden that perhaps Plaintiff needed a couple more weeks but it was up to the others to make the decision. (Id. at 101:14–18.)  Little then left the room. (Id.)  Plaintiff admitted that nothing discriminatory occurred at that audition. (DSUF ¶ 75; PR ¶ 75.)

After the audition, Holden approached Plaintiff and told him, "Oh, we got to let you go from the course, you're out." (Punzo Dep. 101:21–23.)  Plaintiff responded that the whole thing was a disgrace and that it was not a level playing field. (Id. at 101:24–102:4.)  Holden suggested that Plaintiff not worry about anyone else, and Plaintiff left. (Id. at 102:3–7.)

When Plaintiff got to his car, he called Human Resources employee Jim King to ask him about another position in the Casino, and King agreed to look for something else. (Id. at 103:19–104:4.)  The next morning, however, Holden called Plaintiff at home and said, "I heard you reached out to Jim King. . . . Let me tell you one thing I want to tell you, you're not qualified for any job in this company, okay, none at all, and I'll make sure of it." (Id. at 104:7–15.)  King then got back to Plaintiff and said his hands

were tied because Holden did not like what had happened with Plaintiff.  (Id. at 104:16–22.)  Plaintiff

believed Holden hated him because Plaintiff criticized his process, and he believed Holden had problems

"with every kind of race."  (Id. at 106:18–107:9.)

### G.     Plaintiff's Claims of Discrimination

Overall, Plaintiff believed he performed well enough to pass the auditions in comparison to the

other students.  (DSUF ¶ 81; PR ¶ 81.)  Plaintiff also complained that the auditions were not on a level

playing field because there were not the same number of auditioners in each audition, everyone did not

have to deal the same number of hands, everyone did not have to shuffle, and other students were not

required to perform "buy-ins."  (DSUF ¶ 82; PR ¶ 82.)

The first time that Plaintiff raised with Holden issues regarding nepotism, age, and ethnic

problems was after the third audition.  (Punzo Dep. 155:13–22.)  Plaintiff felt that McQueen discriminated

against him on the basis of nationality and Holden discriminated on the basis of age and nationality.  He

did not think, however, that either Lewis, Condella, or Little were discriminatory.  (DSUF ¶ 84–86; PR

84–86.)

On September 26, 2019, just after his third audition, Plaintiff sent an email to the Head of Table

Games, Bob Little:

> Mr. Little I appreciate you taking time today to sit in on the audition and
> apologize you were brought into the situation.  I am a finance major and
> Corporate person who was injured in 2012 and was cleared to get back in
> workforce.  I really needed a position like everyone else and to your
> disliking there are many inconsistent and unfair problems with the
> program.  During my first audition I was last person to audition so I hear
> everyone come out and sherry told them the mistakes who miscounted
> paid out wrong pays forgot to deal card had black jack and didn't look
> and many other major errors yet they passed these same people with
> Howard in class watching overpaid our teacher large sums of money had
> poor card placement ect [sic] yet they passed.
>
> My second audition I dealt 9 hands had to shuffle and had every scenario
> and the reasons I failed that audition I actually correct every mistake in
> this one.  But in that second audition the other two people on the ropes to
> pass walked in didn't have to shuffle no one bought in they just dealt 3
> hand and that's it.  Their audition was another standard.  How do I know

this is that my whole class looked up to me cause as Sherry said and as she said again tonight Frank you know the game inside out these kids don't yet I'm out of the program.  Out of 10 students 4 had relatives working at sugarhouse as dealers, who gave massages to the teacher ect yet I'm on the outside.  That whole process and how I was treated was very unprofessional I was discriminated and made a spectacle of.  If you sat in on all their auditions no one would make it through.  Sorry for being so long.  I agree with you if I had another couple weeks I could clean it up but they didn't give me a chance because I exposed their problems.

(ECF No. 16-1, Ex. B.)

Little forwarded this email to Bruce Condella, and Condella responded, "Wow.  This is exactly why he would not be a good fit.  We give everyone who enters the program the same opportunity."  (Id.)

Plaintiff sent another email to Jim King on September 27, 2019, stating:

I was made a spectacle yesterday.  I had audition on Wed 3 of us had to re audition my audition was 7 hands in front of marissa and Bruce.  They call me in deliberate call me in again say I failed and said Howard would have to make decision on Thursday when he returns.  Other students in class look up to me I helped them understand game even sherry said "you know game these kids don't."  So next person Roman comes out of his audition and tells me he made some mistakes had to deal 3 hands didn't have to shuffle only marissa was there and she didn't buy in he just dealt 3 hands.  The auditions have different standards for different people.

So yesterday I walk in and instead of bing [sic] professional calling me to an office in middle of cafeteria Howard says we are giving you another audition today because you felt your audition was not right.

I walk in room and its Howard Bruce Sherry at table as customers and Mr. Little as sort of a pit boss overseeing my audition.  He says will you accept what is said at this audition what am I gonna say no?

So I deal hands around 5 and he makes his critique make long story short asks what week are we in school sherry says 4 he says I don't feel he is ready yet maybe he can go another week in other class ect so he leaves and Bruce Howard and sherry make me leave room to talk about it.

Howard comes out and says since you didn't pass we got to drop you out of program and he beings to walk away and I ask him can I say something and we start not arguing but disagreeing about how was that fair it was more pressure 3 people and director so I left.

Look Jim I managed people for years at Sunoco Wachovia and US Bank I am very experienced with HR and hiring issues quotas ect.  Bottom line

> is product that passed need a lot of work some more than me but passed
> for diff reasons they all went through my audition no one would pass.

(Id.)

Later that day, Jim King forwarded this email to Howard Holden and Human Resources Business
Partner Director Richard Woodruff regarding how to handle Plaintiff's request for a position within the
Casino.  (Id.)  Woodruff responded, "Hey Jim, I talked to Howard.  He said talked to you as well.  It
seems this candidate doesn't have the technical skills or positive attitude to be successful in any role at
SugarHouse.  So, we need to let him off the hook and move on."  (Id.)

In an October 4, 2019 email to Jim King, Plaintiff specifically raised issues of nepotism, age, and
ethnic discrimination:

> Jim hope your well.  Today I received a call from Howard.  He said it was
> his assessment that I am not the right person to work anywhere at
> sugarhouse because of my attitude wit situation with audition.  You can
> check my resume I am a corporate management employee of over 30 yrs
> he is very unprofessional.  I passed your basic sugarhouse interview then
> second interview.  Because I brought to light that process they have has
> issues with nepotism age and ethnic problems he black balls me from
> getting a position.  You and Michael are very professional and great
> people persons.  I came to you after first audition before I even had
> blowout with Howard for something else in company.   He is
> discriminating against me and personally using me as an example.  I'm
> bumping this up the corporate ladder on him and looking into getting an
> attorney involved I have statement emails from 6 fellow students saying
> I was messed with and were witness to it Howard should have just calmed
> down and had no right calling me today and labeling me like he did.

(ECF No. 16-1, Ex. C.)

King forwarded this email to Richard Woodruff.  Woodruff responded the same day saying,
"Thank you Jim.  This candidate is just disgruntled.  I instructed Howard to call Francis."  (Id.)

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or
> defense—or the part of each claim or defense—on which summary
> judgment is sought. The court shall grant summary judgment if the
> movant shows that there is no genuine dispute as to any material fact and

> the movant is entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue of material fact. Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  "The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." El v. Se. Pa. Transp. Auth. (SEPTA), 479 F.3d 232, 238 (3d Cir. 2007).  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

### A.   **Plaintiff's Claims of National Origin and Age Discrimination**

Plaintiff brings claims for (a) national origin discrimination under Title VII and the PHRA, and (b) age discrimination under Title VII and the PHRA.  For purposes of assessing these claims, the PHRA has been interpreted in a similar fashion to Title VII. Ahern v. Eresearch Tech., Inc., 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016) (citing Dici v. Commw. Pa., 91 F.3d 542, 552 (3d Cir. 1996)).  Similarly, "Title

VII and the ADEA have been given parallel constructions due to their similarities in purpose and structure." DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 724 n.5 (3d Cir. 1995). Accordingly, I address these claims together.

To establish a claim of discrimination, a plaintiff must show that an employer had a discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire. Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983). A plaintiff may succeed in a discrimination claim against an employer either by (1) providing direct evidence of discrimination, or (2) by relying on indirect evidence of discrimination through the McDonnell Douglas burden-shifting scheme. McIlvaine v. ISEO Techs., Inc., 485 F. Supp. 3d 582, 585 (E.D. Pa. 2020) (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999)).

Plaintiff concedes that he has no direct evidence of discrimination,[4] and, accordingly, he must rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff must first prove by a preponderance of evidence a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802. Next, if the plaintiff establishes a *prima facie* case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. Id. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981). Rather, the defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. Id. Finally, if the employer meets its burden of production, the plaintiff bears the ultimate

---

[4]    Direct evidence is described as overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision. Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004).

burden of convincing the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Here, Defendant contends that it is entitled to summary judgment on two grounds.  First, it argues that Plaintiff cannot establish a *prima facie* case of national origin or age discrimination.  Second, Defendant claims it has enunciated a legitimate non-discriminatory reason for not hiring Plaintiff and Plaintiff has no evidence on which to establish that this articulated reason was a pretext for discrimination.

### 1.  *Prima Facie* Case

To establish a *prima facie* case of national origin or age discrimination, a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410–11 (3d Cir. 1999).  Under the fourth element, a plaintiff can satisfy his burden by presenting evidence upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons."  Equal Emp. Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990).  One way that a plaintiff can make such a showing is by demonstrating that he was treated less favorably than similarly situated employees outside of the protected class.  Jones, 198 F.3d at 413.  Alternatively, a plaintiff may "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action."  Greene v. Virgin Islands Water & Power Auth., 557 F. Appx. 189, 195 (3d Cir. 2014).

For purposes of the current Motion, Defendant does not dispute Plaintiff's showing on the first three elements of the *prima facie* case.  Indeed, it is undisputed that Plaintiff is Italian-American and was fifty-seven years old at the relevant time, that he was enrolled in the Dealer School, and that he suffered an adverse employment action when not hired as a dealer.  Defendant contends only that Plaintiff failed to demonstrate that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination on the basis of national origin.

Plaintiff responds that the circumstances surrounding Defendant's use of more rigorous audition standards and refusal to offer him employment give rise to an inference of discrimination where none of Plaintiff's classmates were treated similarly.  Specifically, he notes that: (a) none of his classmates were subjected to the same rigorous audition conditions (*i.e.*, asked to deal more hands, shuffle more decks); (b) even though he outperformed his classmates in the Dealer School and during auditions, he was not offered employment; (c) other classmates who made mistakes during the audition still passed; and (d) other students received feedback and were given the opportunity to correct their mistakes, but he was not.

Such allegations, which consist solely of Plaintiff's own subjective beliefs about these matters, is insufficient to raise an inference of discriminatory animus.  The "central focus" of the *prima facie* case "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.  Pivirotto, 191 F.3d at 352 (quotation omitted).  In Sarullo v. U.S. Postal Service, 352 F.3d 789 (3d Cir. 2003), the Third Circuit considered the grant of summary judgment in favor of the Postal Service on a claim of national origin and age discrimination by the plaintiff.  The plaintiff had been terminated from his position after an investigation revealed that he was dealing drugs at work.  Id. at 791–93.  After the criminal charges against him were dismissed, the plaintiff brought a claim alleging that he was not reinstated to the Post Office because of his Native American ancestry and his age.  Id.  The Third Circuit affirmed the grant of summary judgment noting that the plaintiff's evidence of race discrimination consisted solely of his own assertion that he was not rehired because he is Native American.  Id. at 798.  The plaintiff attempted to support that allegation "using his own deposition and affidavits suggesting that most of his coworkers and supervisors knew that he was Native American and some of them called him derogatory nicknames referencing his Native American heritage."  Id.  The Third Circuit found that such evidence failed to establish a causal nexus between his membership in a protected class and the decision to not rehire him.  Id.  Moreover, the Court remarked that although co-workers and supervisors knew about the plaintiff's national origin and age, the ultimate decisionmaker was unaware of these characteristics.  Id. at 799.

17

Similarly here, Plaintiff—having failed to depose any employee of Defendant—speculates that he was not offered a position as a dealer because he was Italian-American and fifty-seven years old. Beyond his own beliefs, however, Plaintiff does not point to sufficient evidence to survive summary judgment.  Plaintiff relies heavily on comments by Dealer School instructor McQueen, who made remarks that Plaintiff was a "mob thug" or had a "mob look," or that he was a "Dago Italian" who had mob connections.  The undisputed facts reveal, however, that McQueen was simply the course instructor and not a decisionmaker who participated in or made recommendations regarding who passed auditions. Although McQueen participated in Plaintiff's third audition, she had no role in any decision as to whether a student passes or fails.  "[C]omments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination."  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997).

Plaintiff also relies on comments by Holden, who was a decisionmaker, who referred to Plaintiff as "old head" on several occasions.  Aside from the fact that this singular comment is vague at best as to its connotations, any alleged discriminatory animus is undermined by the fact that Holden was only one year younger than him.  See, e.g., Tucker v. New York City, No. 05-cv-2804, 2008 WL 4450271, at *5 (E.D. Pa. Sept. 30, 2008) (noting that any inference of discrimination is undermined by the fact that the decisionmakers belonged to the same protected class as plaintiff); Meyer v. State of NY Office of Mental Health, 174 F. Supp. 3d 673, 6870088 (E.D.N.Y. 2016) ("It is a well-settled, albeit not dispositive, principle that where the alleged discriminator is a member of the same protected class as Plaintiff, an inference against discrimination exists and claims of discrimination become less plausible." (collecting cases)).  Moreover, although Holden noted, on a single occasion, that Plaintiff would "pull his knife and cut you up," this stray comment, untethered to any decisionmaking process, does not clearly implicate either age or national origin.  Indeed, Plaintiff expressly testified that the reason Holden did not like him was because Plaintiff questioned his management style, not because of age or national origin discrimination.

More importantly, Plaintiff has failed to adduce any evidence that individuals outside the protected class were treated more favorably. In fact, the evidence shows the contrary. It is undisputed that Plaintiff's classmate, Mr. Forte, who was also of Italian descent, was offered a position as a dealer. It is also undisputed that a seventy-seven year old student in the morning session of Dealer School was similarly offered a position. Finally, although Plaintiff speculates that he was subjected to more rigorous auditions and given less leeway to make mistakes than others outside his protected class, he lacks any personal knowledge of these facts and fails to cite to any supporting deposition testimony from any of Defendant's representatives.

Absent some evidence from which a factfinder could conclude that Defendant's decision to not offer Plaintiff a position was made on the basis of some national origin-based or age-based animus, Plaintiff cannot establish an issue of fact on his *prima facie* case. As set forth below, I also conclude that Plaintiff has failed to rebut Defendant's proffered legitimate, non-discriminatory reason for its actions.

2.      Legitimate Non-Discriminatory Reason and Pretext

If a plaintiff establishes a *prima facie* case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802–03. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981). Rather, the defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. Id.

Once the defendant has satisfied its burden of production at the second stage, the court turns to the third and final aspect which "is usually the determinative stage of the case." Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 412 (3d Cir. 1999). "In order to survive summary judgment when an employer has articulated a legitimate non-discriminatory reason for its action, a plaintiff must submit

evidence from which a reasonable fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) conclude that discrimination was more likely than not a motivating or determinative cause of the employer's action." Saellam v. Norfolk Southern Corp., No. 06-cv-123, 2008 WL 5286836, at *7 (W.D. Pa. Dec. 19, 2008).

Under the first method of discrediting the employer's reasons, the plaintiff "need not 'produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond [his] prima facie case." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998) (quoting Fuentes v. Perksie, 32 F.3d 759, 764–65 (3d Cir. 1994)). However, the plaintiff also cannot simply show that the employer's decision was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Fuentes, 32 F.3d at 765. Thus, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id.; see also Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) ("[T]he plaintiff must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.").

To show pretext under the second method—that discrimination was more likely than not a cause for the employer's action—"the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that" the plaintiff's protected trait "was a motivating or determinative factor in the employment decision." Simpson, 142 F.3d at 644–45. Among other things, the plaintiff may show that the employer has previously discriminated against him/her, has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.

Saellam, 2008 WL 5286836, at *7.  Ultimately, the burden of proving pretext is a difficult one.  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005).

Here, Defendant has adequately proffered a legitimate, nondiscriminatory reason for not hiring Plaintiff as a table games dealer—he did not pass any of his auditions.  Indeed, in his deposition, Plaintiff admitted that he made mistakes during his first and second auditions.  (See, e.g., Punzo Dep. 82:21–24 ("So I dealt the hands, and certain things, like maybe the chips fell over.  I forgot to do—I knew my mistakes.  I forgot to do insurance one time.  I paid it out wrong.")  In an effort to establish that this reason was pretextual, Plaintiff puts forth several arguments, none of which meet his difficult burden.

First, Plaintiff contends that he was subjected to more rigorous audition conditions than other students such as having to deal more hands, being required to shuffle more decks, not being told his mistakes, and having only one auditioner.  This argument fails on several grounds.  Plaintiff offers scant proof for such allegations and rests his claims on what the other students told him when they came out of their auditions, not on his own personal knowledge.  He presents no deposition testimony from any of Defendant's employees or any of the other students in his class regarding precisely what was involved in any audition or whether his audition was so different as to raise an issue of pretext.  Moreover, even assuming differences existed, Table Games Shift Manager, Maritza Lewis, explained that auditions are designed to be different and that the number of hands each student dealt varied depending on how well the student performed; if a student was not performing well, the auditioner may allow that individual to deal additional hands.  (Lewis Decl. ¶¶ 11–12; see also Punzo Dep. 85:16–19 ("[e]ach student had a different audition.")  "[I]t is axiomatic that the mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext unless the method that was used is so deficient as to transgress the Fuentes standard."  Kautz, 412 F.3d at 471.  It is also undisputed that Plaintiff was, in one respect, treated more favorably than other students in that after he failed his first and second auditions, he was provided with a third audition, which is not typically offered to students.

Second, Plaintiff relies on the various comments from Ms. McQueen and Mr. Holden to argue that that a factfinder could conclude by a preponderance of the evidence that his race or age was a motivating or determinative factor in the employment decision.  Again, this argument does not create an issue of fact as to pretext.  As discussed in detail above, the remarks by Ms. McQueen were stray comments by a non-decisionmaker.  Moreover, the comment of "old head" by Mr. Holden constitutes an isolated remark untethered to any employment decision and simply does not create a genuine issue of material fact regarding Defendant's motives.  See Fuentes, 32 F.3d at 767 (stray remarks divorced from employment decisions do not support a conclusion of pretext); Pineda v. Phila. Media Holdings LLC, 542 F. Supp. 2d 419, 428 (E.D. Pa. 2008) (supervisor's alleged comments that Puerto Rican male "had to represent his people," that he "wasn't supporting his people," and "what kind of Puerto Rican are you" did not demonstrate pretext since the plaintiff had not proven that these statements were in any way related to any of the employment decisions).

Third, Plaintiff contends that other students outside his national origin class were treated differently.  According to Plaintiff, a female student[5] admitted she made a mistake when she issued the wrong payout of $200,000, but the student was advised that she still passed.  Plaintiff also asserts that he outperformed other students in Dealer School, but he was still not offered employment.  Plaintiff's evidence, however, consists entirely of his own deposition testimony through which he communicates hearsay statements from the other students.  Plaintiff has no personal knowledge as to what occurred in the auditions of the other students, provides no details about these students or their alleged errors, and has not offered the deposition testimony of either the auditioners or the students.  "Plaintiff's allegations regarding comparator employees are too general and lacking in context to support his discrimination claim."  Saellam, 2008 WL 5286836, at *10.  Moreover, Plaintiff's subjective belief that his errors were less egregious than those of his fellow students is insufficient to allow a jury to discredit Defendant's

---

[5]     In his deposition, Plaintiff described this student as a Caucasian female.  (Punzo Dep. 86:10–16.)  In his brief, however, he refers to her as an African-American female.  (Pl.'s Opp'n Summ. J. 7.)

proffered non-discriminatory reason. "The fact that an employee disagrees with an employer's evaluation of him does not prove pretext." Frazan v. Vanguard Grp., Inc., 582 F. App'x 105, 108 (3d Cir. 2014) (quoting Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991)).

In short, viewing all the facts in the light most favorable to Plaintiff, Plaintiff has not produced sufficient evidence from which a jury could conclude that the purported reasons for Defendant's dismissal of Plaintiff from the Dealer School were in actuality a pretext for intentional discrimination based on either national origin or age.

### B.  Plaintiff's Claim of Hostile Work Environment

Defendant next moves to dismiss Plaintiff's claim for hostile work environment.  The United States Supreme Court has explained "[w]orkplace conduct is not measured in isolation," so when a workplace "is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), and Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  To succeed on a hostile work environment claim, the plaintiff must establish that (1) the employee suffered intentional discrimination because of his protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.  Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment." Komis v. Sec'y of U.S. Dept. of Labor, 918 F.3d 289, 293-94 (3d Cir. 2019).  "The 'severe or pervasive' element requires [a plaintiff] to show that her work environment became so abusive because of the discriminatory actions by her supervisors

and co-workers that it changed the very nature of her employment." Komis v. Perez, No. 11-cv-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014). "To judge whether such an environment is hostile or abusive, [a court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999) (quoting Harris, 510 U.S. at 23 (1993)). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to discriminatory changes in the terms and conditions of employment. Clark Cnty, 532 U.S. at 271.

Upon review of the record before me, none of the facts identified by Plaintiff and supported by the evidence objectively give rise to "severe or pervasive" discrimination resulting in discriminatory changes in the terms and conditions of employment.[6] Taking all of the evidence in the light most favorable to Plaintiff, the facts suggest that Ms. McQueen, and to a lesser extent Mr. Holden, were unprofessional and generally uncivil. As Title VII is not a "general civility code . . . the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not support a hostile work environment claim." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted). Thus, Ms. McQueen's casual comments regarding Plaintiff's mob connections or Mr. Holden's use of the term "old head" do not rise to a change in the terms and conditions of Plaintiff's employment, but rather constitute unpleasant workplace teasing. See Canada v. Samuel Grossi & Sons, Inc., 476 F. Supp. 3d 42 (E.D. Pa. 2020) (holding that "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than

---

[6]     Plaintiff does not even acknowledge Defendant's argument regarding his hostile work environment claim, let alone identify evidence to support this claim. "Where a Plaintiff has brought a cause of action which is challenged through motion for summary judgment as legally insufficient, it is incumbent upon the Plaintiff to affirmatively respond to the merits of a summary judgment motion, and argue in some fashion the legal sufficiency of the complaint." Whitaker v. Springettsbury Twp., No. 08-cv-627, 2010 WL 1565453, at *15 (M.D. Pa. Apr. 19, 2010). "Indeed, a Plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues." Id. (citing cases).

a few incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments." (quotation omitted)); <u>LaRochelle v. Wilmac Corp.</u>, 210 F. Supp. 3d 658, 694 (E.D. Pa. 2016) (granting summary judgment in national origin hostile work environment claim where a co-worker refused to work with plaintiff because of her nationality and the way she spoke English, another co-worker called her a "stupid immigrant" and "bitch" and said all aliens should be made to return to their countries, and the manager tolerated these comments, assigned plaintiff the more difficult assignments, and accused plaintiff of faking injuries; court found that the comments did not rise to the level of severe or pervasive); <u>Langadinos v. Appalachian Sch. of Law</u>, No. 05-cv-039, 2005 WL 2333460, at *7 (W.D. Va. Sept. 25, 2005) (granting summary judgment on national origin hostile work environment claim where law school dean made comments to plaintiff about looking like he was in the "Sopranos," being related to John Gotti, and looking like a gangster and a member of the mafia, all of which continued over a year and a half).

### C.   Plaintiff's Retaliation Claim

The last cause of action at issue is Plaintiff's claim of retaliation.  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." <u>Nelson v. Upsala Coll.</u>, 51 F.3d 383, 386 (3d Cir. 1995).  If the employee establishes this *prima facie* case of retaliation, the familiar <u>McDonnell Douglas</u> approach applies in which "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500–01 (3d Cir. 1997).

For purposes of the first prong of a *prima facie* case of retaliation, protected "opposition" activity includes not only an employee's filing of formal charges of discrimination against an employer but also

"informal protests of discriminatory employment practices, including making complaints to management." Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)). That is, in determining whether a plaintiff adequately opposed discrimination, "we look to the message . . . conveyed [by a plaintiff's conduct] rather than the means of conveyance." Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (quoting Curay–Cramer, 450 F.3d at 135). The opposition must be to discrimination based on a protected category, such as age or race. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015). Furthermore, in making the opposition, the plaintiff must have an "objectively reasonable belief" that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute. Id. at 193–94. Stated differently, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008).

Here, Plaintiff's entire argument in opposition to summary judgment asserts:

> In the instant case, Plaintiff complained of discrimination and disparate treatment. Defendant concedes as much. Following Plaintiff's complaint of discrimination, he was subjected to an adverse employment action when he was subjected to disparate treatment (different terms and conditions) during the hiring process when he was subjected to more rigorous audition standards (i.e., asked to deal more hands, shuffle more decks, had only one auditioner etc.), he was removed from the Dealer School and when he was denied employment by Defendant. [sic] This is particularly clear where Mr. Condella sent a message to other management stating that Plaintiff's protected activity is the reason why they should let him go. Considering the temporal proximity, a mere matter of days, between Plaintiff's protected activity and the adverse employment actions Plaintiff was subjected to, Plaintiff should enjoy an inference that Defendant intended to retaliate against him due to his protected activity. Accordingly, this element is met.

(Pl.'s Opp'n Summ. J. 9–10.)

A review of the evidence, however, does not bear out Plaintiff's claims. Although Plaintiff may have complained about general unfairness in the process during his auditions, Plaintiff concedes that he

never raised issues regarding nepotism, age, and ethnic problems until he spoke with Holden after the third audition, which was subsequent to his removal from the Dealer School. (Punzo Dep. 155:13–22.)

In his email to Bob Little after this third audition, Plaintiff again failed to address discrimination on the basis of any protected class. Rather, Plaintiff simply challenged his evaluation during the audition and complained how other students made mistakes but nonetheless passed. While Plaintiff stated that the "whole process and how I was treated was very unprofessional I was discriminated and made a spectacle of," nothing in the emails suggests any complaint of discrimination based on a protected category. (ECF No. 16-1, Ex. B.) In turn, no reasonable factfinder could conclude that Condella's response—that Plaintiff would not be a good fit because of his complaints—constituted unlawful retaliation. Rather, the sole reasonable inference is that Condella found that Plaintiff's complaints of general unfairness reflected unfavorably on his character as an employee.

Plaintiff's September 27, 2019 email to Jim King likewise does not constitute protected activity. In that email, Plaintiff again identified discrepancies between his auditions and the auditions of the other students, and he described his third audition and the decision to remove him from the dealer school. At no point in that email did Plaintiff mention discrimination based on age or national origin. (Id.) It was in response to that email, and not any protected activity, that Holden and Woodruff decided that Plaintiff did not "have the technical skills or positive attitude to be successful in any role at SugarHouse. So, we need to let him off the hook and move on." (Id.)

Indeed, the sole piece of evidence reflecting Plaintiff's complaints of unlawful discrimination is his October 4, 2019 email to Jim King, wherein Plaintiff alleges that he received a call from Holden earlier that day and brought to light issues that Defendant had with nepotism, age, and ethnicity. Plaintiff threatened to get a lawyer. (ECF No. 16-1, Ex. C.) Following this clear protected activity, however, Plaintiff suffered no additional adverse employment actions. Plaintiff had already been dismissed from Dealer School and had already been told that he would not be considered for another position within the

Casino.  Thus, Plaintiff cannot meet his burden of showing a causal connection between this protected activity and his lack of employment with Defendant.

As no reasonable juror could conclude that Plaintiff met his *prima facie* case of retaliation, I will grant Defendant's Motion for Summary Judgment on this claim.

## IV.    CONCLUSION

In light of the foregoing, I will grant Defendant's Motion in its entirety and enter judgment in favor of Defendant on all of Plaintiff's claims.  An appropriate Order follows.